**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA**

| | |
|---|---|
| DAVID and INGRID BURGESS, husband and wife; and SHERWIN M. FELLEN, an individual; | 3:03-cv-0707-ECR-RAM |
| Plaintiffs, | **ORDER** |
| vs. | |
| L. LANCE GILMAN; CASH ADMINISTRATION SERVICES, LLC; CASH MANAGEMENT SERVICES, LLC; CASH PROCESSING SERVICES; and CASH ASSET MANAGEMENT, LLC; | |
| Defendants. | |

Plaintiffs David and Ingrid Burgess and Sherwin M. Fellen (hereinafter "Plaintiffs" or "the Burgesses") initiated this action on December 23, 2003 by filing a Complaint (#2), then filed a first amended complaint (#10) on January 8, 2004, and again amended their complaint (#42) on April 26, 2004. Defendants L. Lance Gilman; Cash Administration Services, LLC; and Cash Management Services, LLC (hereinafter "Defendants");[1] answered (#26) the Second Amended Complaint (#42) and filed a counterclaim for infringement and unfair competition under the Lanham Act on May 20, 2004. Both

---

[1] The other Defendants, Cash Processing Services ("CPS"), and Cash Asset Management, LLC ("CAM"), apparently did not join in that answer, but are incorporated into the references to "Defendants" in this order except where otherwise specified.

Defendants and Plaintiffs filed motions for preliminary injunction. (### 94, 95, 96.)  Judge Hagan granted Plaintiffs' motion and denied Defendants' (#101).  The Burgesses, Defendant Cash Asset Management ("CAM"), and Defendant Cash Processing Services ("CPS" have all filed Motions for Summary Judgment (### 149, 150, 151).  A hearing on the motions was held on February 7, 2006.  Argument was heard on the Burgesses' and CPS's motions (##149, 151).  CAM's motion (#150) was submitted on the pleadings.

The motions being ripe, we address them herein.  For the reasons stated below, Defendant's motion (#23) will be **DENIED**.

I.  **FACTUAL HISTORY**

From 1971 until approximately 1990, Joseph and Sally Conforte owned and operated the Mustang Ranch as a legal brothel in Storey County, Nevada.  (CPS Mot. (#149), Ex. 1 & 3.)  When the Confortes filed for bankruptcy in 1990, the property was purchased at auction by Mustang Properties, Inc.  (Id., Ex. 3.)  Mustang Properties, Inc., then sold the property to AGE Corporation, Inc., and AGE Enterprises, Inc., two corporations associated with Conforte, which operated the Mustang Ranch as a brothel and sold goods associated with the mark between 1990 and 1999.  (Id.)

In 1999, AGE Enterprises and AGE Corporation were convicted of racketeering.  (Id.)  On August 9, 1999, the Government seized the brothels.[2]  (Pl.'s Mot. (#151), Ex. C.)  On July 12, 1999, a

---

[2] Various governmental entities have maintained control over the Mustang Ranch at various times during the period examined here, including the IRS and the Bureau of Land Management ("BLM").  Both the IRS and the BLM are subsumed under our use of the term "the

Preliminary Order of Forfeiture granted the Government twenty million dollars, all the stock, interests in and assets of the accounts receivable and real property owned by AGE Corporation and AGE Enterprises. (Id., Ex. B.)  On March 9, 2001, after the disposition of all notices of interest, the Final Order of Forfeiture was entered granting the United States Government title to the property. (CPS's Mot. (#149), Ex. 5.)  The Final Order was immediately stayed pending appeal to the Ninth Circuit Court of Appeals. (Id., Ex. 6.)  The Court of Appeals affirmed the convictions on June 29, 2001, United States v. AGE Enterprises, Inc., 15 Fed. Appx. 439 (9th Cir. 2001), and the Supreme Court denied certiorari on April 29, 2002, United States v. Colletti, 535 U.S. 1035 (2002).

From 1999 until some point in 2003, the Government was publicly examining its options for the property and considering the potential for maximizing financial, political, and environmental benefits. (See CPS's Mot. (#149), Brandt Depo. at 62-65; Id., Struble Depo. at 42, 90-91; Id., Brandt Decl., Ex. A.)  According to newspaper articles cited by Plaintiffs, the Government had no intention to operate the Mustang Ranch as a brothel, but rather, was "thinking about reopening the Mustang Ranch . . . as a tourist attraction and research center for wild horses."[3]  (Pl.'s Mot. (#151), Ex. F.)  However, in their depositions, Government Attorney

---

Government.  Thus, our use of the term "the Government" may refer to one or both entities, depending on the context and specific time period to which we are referring.

[3] Our treatment of newspaper articles as hearsay will be discussed below.

3

1  Alf Brandt and Public Affairs Officer Mark Struble maintained that
2  while the Government did not have the "expertise" itself to be
3  operating a brothel, and would probably be using the land for other
4  purposes, it was considering options of selling or licensing the
5  Mustang Ranch buildings and trademark to a third party, who
6  potentially could use those assets to operate a brothel.  (See
7  CPS's Mot. (#149), Brandt Depo. at 89, 161; Id., Struble Depo. at
8  47-49.)  The IRS transferred the Mustang Ranch property to the
9  Bureau of Land Management ("BLM") in February of 2003.  (Id.,
10 Brandt Decl., Ex. A.)  The transfer agreement prohibited the use of
11 the Mustang Ranch property as a brothel.  (Id. at 4.)  The BLM
12 ultimately determined that there should be no structures on the
13 significant portion of the land which was located in a flood plain
14 and decided to have the structures removed, possibly by selling
15 them to someone who would remove them and use them elsewhere.
16 (Struble Depo. at 48, Brandt Depo. at 161.)
17      The Government auctioned off items of personal property, many
18 of them bearing the Mustang Ranch mark, on December 14, 2002.
19 (Pl.'s Mot. (#151), Ex. J.)  According to Alf Brandt, the
20 Government continued to auction off personal items on eBay, an
21 online auction service, from March through July or August of 2003.
22 (CPS's Mot. (#149), Brandt Depo. at 43.)  The BLM made its first
23 attempt to auction the Mustang Ranch buildings on eBay in June of
24 2003. (Pl.'s Mot. (#151), Ex. CC.)  The first auction attempt,
25 which purported to sell "the World Famous Mustang Ranch . . . in
26 its entirety," but which did not specifically mention the
27 trademark, failed to meet the Government's minimum bid.  (Id.)  The
28

Government then conducted a second eBay auction in October of 2003, this time for the buildings and the "World Famous Mustang Ranch trademark." (Id., Ex. DD.) Defendant Lance Gilman was the high bidder on the Mustang I building and the Mustang Ranch trademark, which he purchased for $145,100 on October 16, 2003. (CPS's Mot. (#149), Brandt Decl. at 3; Id., Gilman Decl. at 3.) Gilman apparently acquired the mark on behalf of Defendant Cash Administration Services, which later assigned all interest in the mark to TG Investments, which in turned assigned the rights to Defendant CPS. (Id.; Brandt Decl. at 3; Id., Gilman Decl. at 3-4, Ex. P.)

Lance Gilman is the owner and manager of Defendants CAM and CPS. (CAM's Mot. (#150), Gilman Decl. (5/16//05).) CAM owns the Wild Horse Ranch brothel. (Id., Ex. 1.) Shortly after TG Investments assigned the rights to the Mustang Ranch to CPS, CAM placed an ad for the Wild Horse Ranch brothel alongside and partially overlapping CPS's ad for the Mustang Ranch in the Yellow Pages. (Id. Gilman Decl. (5/16//05).)

In the meantime, Plaintiffs were taking their own steps to secure the Mustang Ranch trademark, which they believed had been abandoned by the Government during its ownership of the property. Fellen filed an application to register the mark on March 17, 2003, and then licensed the mark to the Burgesses. (Pl.'s Mot. (#151), Ex. Y at 6.) The Burgesses began using the mark in connection with their brothel business on April 15, 2003, when they began answering their phones by stating "Mustang Ranch." (Id. at 2.) The Burgesses installed their first exterior "Mustang Ranch" sign on

5

1  October 10, 2003.  (Id.)  The Burgesses attempted to contest the
2  BLM's sale of the mark on eBay, but to no avail. (Id., Ex. GG.)
3  After selling the mark to Gilman, the BLM notified the Burgesses
4  that their use of the mark infringed on the Government's rights,
5  and that BLM would advise Gilman of the infringement and of his
6  responsibility to protect the mark. (CPS's Mot. (#149), Brandt
7  Decl. Ex D.)

## II. DISCUSSION

At the February 7 hearing on the instant motions, Defendant CPS asserted that there were genuine issues of material fact regarding abandonment, and thus conceded its own motion for summary judgment (#149) on the issue of ownership of the Mustang Ranch trademark. CPS's other issue, that Plaintiffs' use is likely to cause confusion, remains for consideration. Therefore, there are three main issues to be considered in this order: 1) Did the Government and/or Defendants abandon the mark? (Pl.'s Mot. #151) 2) Is Plaintiff's use of the mark likely to cause confusion? (CPS's Mot. #149) and 3) Has Defendant CAM infringed Plaintiff's mark? (CAM's Mot. #150).

### A. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists. Nw. Motorcycle Ass'n v. U.S. Dep't. of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom "in the light most favorable to the nonmoving party," Bagdadi v.

6

1 Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary
2 judgment where no genuine issues of material fact remain in dispute
3 and the moving party is entitled to judgment as a matter of law.
4 Fed. R. Civ. P. 56(c).  Judgment as a matter of law is appropriate
5 where there is no legally sufficient evidentiary basis for a
6 reasonable jury to find for the nonmoving party.  Fed. R. Civ. P.
7 50(a).
8     The moving party bears the burden of informing the court of
9 the basis for its motion, together with evidence demonstrating the
10 absence of any genuine issue of material fact.  Celotex Corp. v.
11 Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met
12 its burden, the party opposing the motion may not rest upon mere
13 allegations or denials in the pleadings, but must set forth
14 specific facts showing that there exists a genuine issue for trial.
15 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
16 Although the parties may submit evidence in an inadmissible form--
17 namely, depositions, admissions, interrogatory answers, and
18 affidavits--only evidence which might be admissible at trial may be
19 considered by a trial court in ruling on a motion for summary
20 judgment.  Fed. R. Civ. P. 56(c); Beyene v. Coleman Security
21 Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).
22     In deciding whether to grant summary judgment, a court must
23 take three necessary steps: (1) it must determine whether a fact is
24 material; (2) it must determine whether there exists a genuine
25 issue for the trier of fact, as determined by the documents
26 submitted to the court; and (3) it must consider that evidence in
27 light of the appropriate standard of proof.  Anderson, 477 U.S. at

7

248. Summary Judgment is not proper if material factual issues exist for trial. B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered. Id. Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. Id.

**B.  Abandonment**

The Mustang Ranch Trademark's status as a valid and legally protectable mark is not in dispute by the parties. The crux of the suit is the question of ownership of the Mustang Ranch mark. Plaintiffs contend that the Government abandoned the mark under the Lanham Act, and that Plaintiffs were the first to use the mark after abandonment, and thus are the mark's rightful owners.

The Lanham Act provides:

> A mark shall be deemed to be "abandoned" . . . :
>
> > (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

8

15 U.S.C. § 1127.  "Abandonment of a trademark, being in the nature of a forfeiture, must be strictly proved."  Prudential Ins. Co. of America v. Gibralter Fin. Corp. of Cal., 694 F.2d 1150, 1156 (9th Cir. 1982).

If the party alleging abandonment establishes a three-year period of non-use, then the burden shifts to the other party to rebut the presumption by presenting evidence of actual use, intent to resume use "in the reasonably foreseeable future," or valid reasons for nonuse.  Emergency One, Inc. v. Am. FireEagle Ltd., 228 F.3d 531, 535-37 (4th Cir. 2000); Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396 (9th Cir. 1985).[4]  Determining intent or valid reasons for nonuse requires a factual determination.  See Star-Kist Foods, 769 F.2d at 1396.  The Second Circuit found the presumption to be rebutted where New York stopped operating a water business due to a legislative decision, and where the state had sought continuously thereafter to sell the business with its goodwill and trademark.  Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2nd Cir. 1980).

---

[4] Star-Kist described the requisite intent as "lack of intent to abandon."  769 F.2d at 1396.  However, most recent cases describe the requisite intent as "intent not to resume use," which more closely tracks the language of section 1127.  McCarthy on Trademarks and Unfair Competition, § 17:11 (4th Ed.); see also Silverman v. CBS Inc., 870 F.2d 40, 46 (2nd Cir. 1989) (discussing congressional history wherein proposed language of section 1127 was changed from "intent to abandon" to "intent not to resume"); see also Unuson Corp. v. Built Entertainment Group, Inc., 2006 WL 194052, at 6 (N.D. Cal. 2006) (adopting "intent to use" standard over "intent not to abandon" as every contested abandonment case presents an intent not to abandon) (citing Imperial Tobacco Ltd. v. Philip, 899 F.2d 1575, 1581 (Fed. Cir. 1990).  We find that the "intent to resume use" standard most directly supports the purposes of section 1127.

9

Once the defending party's burden of production is satisfied, "any presumption deriving from the proof of the prima facie case drop[s] out, and [the challenging party] [i]s obligated to prove both discontinued use and intent not to resume use." Emergency One, 228 F.3d at 536. Although the Fourth Circuit in Emergency One and the Federal Circuit have adopted a "preponderance of the evidence" standard for proving "intent not to resume," the Ninth Circuit joins the majority of courts following the standard that abandonment must be strictly proved. McCarthy on Trademarks and Unfair Competition, § 17:12 (4th Ed.); Prudential Ins., 694 F.2d at 1156. While the Ninth Circuit has not defined "strictly proved" further, the majority of courts applying that standard have found that evidence of abandonment must be clear and convincing. See e.g. EH Yacht LLC v. Egg Harbor, LLC, 84 F. Supp. 2d 556, 564 (D.N.J. 2000) (citing McCarthy at § 17:12 (4th Ed.)); Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1355 (E.D. NY 1994).

When the alleged period of nonuse is less than three years, no presumption attaches and the challenging party has the same burden as would a party for which a prima facie case had been rebutted: clear and convincing evidence of nonuse and intent not to resume use in the reasonably foreseeable future. Chere Amie, Inc. v. Windstar Apparel, Corp., 191 F. Supp. 2d 343, 349 (S.D.N.Y., 2001) (citing Stetson v. Howard D. Wolf & Assocs., 955 F.2d 847, 850 (2nd Cir. 1992)).

The kind of "use" that a party must demonstrate under section 1127 is "the bona fide use of such mark made in the ordinary course

10

of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "Thus, neither promotional use of the mark on goods in a different course of trade nor mere token use constitute 'use' under the Lanham Act." Emergency One, 228 F.3d at 536.

The parties dispute whether CPS or its predecessors in interest did not use the mark for a period of at least three years. Plaintiffs claim that neither the Government nor CPS used the mark at all from the time the Government seized the property in August of 1999 until the initiation of this lawsuit. CPS claims that the Government used the mark at the auctions of personal items beginning in December of 2002 and that CPS used the mark through advertisements and "Coming Soon" signs, starting as early as October of 2003.

We find that a few auctions, wherein goods other than brothel services were sold, falls under the category of promotional or token use, and thus the 2002 auction does not toll the period of nonuse. See Emergency One, 228 F.3d at 536. In addition, we find that the Government's mailing cease and desist letters was merely an effort to reserve a right in the mark, and does not constitute bona fide use under section 1127. However, CPS's use of the mark in advertising the brothel which it fully expected to be opening shortly does constitute use of the mark under the statute. Thus, we find that the period of nonuse of the Mustang Ranch spans from the time of seizure in August 1999 until October of 2003. Because that period constitutes more than 3 years, the burden of production shifts to CPS to present evidence of valid reasons for nonuse or intent to resume use.

11

First, we adopt Judge Hagan's finding in an order in a related action that the Government's lack of control over the assets during the period of time between the Preliminary Order of Forfeiture, August 1999, and the Final Order of Forfeiture, June 29, 2001, presents a valid reason for nonuse during that period.  In addition, much like the state of New York in Saratoga, the United States Government has substantial political reasons for not using the Mustang Ranch trademark to operate a brothel.  (See Brandt Depo. at 162, noting intra-agency discussions regarding potential political implications of Government running controversial business.)  However, Plaintiffs argue that unlike New York, the Government did not continuously attempt to sell the mark with the other business assets for the specific use, as the first eBay auction attempt separated out the mark from the other assets.  Nevertheless, we find that CPS has raised at least a genuine issue of material fact as to whether the Government assumed it was auctioning the mark along with the property at the first eBay auction.  The language of the auction website supports this inference as it claims to be selling the entire World Famous Mustang Ranch minus the land, and nowhere does it specifically exclude the mark.  In addition, while the two years between the Final Order of Forfeiture and the eBay auction may seem like a substantial period of nonuse for a private company, it is certainly plausible that it would take the multi-faceted political bureaucracy charged with control of the Mustang Ranch at least two years to assess its assets, engage the public in a discussion over use, divide the assets, and sell the brothel portions to an entity

12

that could operate a brothel. (See Brandt Depo. at 65, noting Government officials were "overwhelmed by the interests and the different opinions.") Thus, we find that CPS has presented at least a genuine issue of material fact regarding valid reasons for nonuse during the period of nonuse.

Because CPS has presented evidence of valid reasons for nonuse, it has rebutted the presumption of abandonment and Plaintiffs must now prove by clear and convincing evidence that the Government intended not to resume use.[5] At this point of the analysis, the uniqueness of our factual scenario becomes evident, because while it is undisputed that the holder of the mark in the period at question did not itself intend to use the mark, CPS argues that the Government did intend to sell the mark to an entity that could use the mark for brothel services in the reasonable future. In determining whether the test for abandonment applies to intent for a third party to use the mark, we find guidance in the analysis engaged in by the District of New Jersey in considering the disposition of a mark in bankruptcy proceedings. That court applied canons of statutory construction to section 1127 in finding that

> [Congress's use] of the term "deemed"–a term that suggests an objective finding of abandonment by a factfinder-shows Congress's intent that a determination of intent not to resume use should be based on the totality of objective evidence of intent to resume use,

---

[5] CPS has probably also met its burden of production by offering evidence of intent to resume use. However, because we have already found evidence of valid reasons for nonuse, we need not address its intent evidence for purposes of rebutting the presumption, and only address it in examining Plaintiffs' evidence of the Government's alleged intent to not resume use.

13

> not simply the intent of the registered trademark owner. Under this standard, so long as there is power to do so, *any* valid intent to resume use within a reasonable time becomes relevant.

EH Yacht LLC v. Egg Harbor, LLC, 84 F. Supp. 2d 556, 566 (D.N.J. 2000). The EH Yacht court then "examine[d] the record for objective indicia of intent not to resume use and for evidence of loss of goodwill." Id. Much like the case at bar, the challenging party in EH Yacht had offered evidence that some of the company's principals had expressed an intent to not resume use of the mark in question. Id. at 567. In addition, the other party had offered evidence that some of the principals had "assumed operations would be re-started under new management." Id. Rejecting a "snap-shot approach," and noting the "confusion surrounding the suspension of operations," the EH Yacht court found that "the open question [as to] whether the company's principals intended to reorganize the business, sell the business to another concern, or simply allow its creditors to seize its assets and operate the business as a going concern until a buyer could be found" necessitated a finding against clear and convincing evidence of intent not to resume use. Id.

We also find that the bureaucratic requirements and political considerations surrounding the acquisition and inter-government transfers of the Mustang Ranch property caution against a finding of clear and convincing evidence of intent not to resume use. While Plaintiffs have produced newspaper articles purporting to represent the beliefs of some government officials that the property would never be used as a brothel, Plaintiffs have not presented admissible evidence of an intent that could be attributed

14

to the Government as a whole that the mark and the buildings could not be used as a brothel by another entity.  See De La Cruz v. Dufresne, 533 F. Supp. 145, 149 (D. Nev. 1982) (newspaper articles are inadmissible pursuant to the hearsay rule).  However, CPS has offered deposition testimony of the Government's time-consuming efforts to assess the value and uses of the property, as well as its one failed and one successful effort to sell the buildings along with the mark to a party that could use those assets for brothel services.[6]  Thus we find a genuine issue of material fact as to whether the Government intended use of the mark to resume within a reasonable period of time.

Furthermore, CPS has provided ample evidence that it always intended to use the mark for a brothel.  Its advertising the brothel since October of 2003, coupled with the complications of obtaining and moving the brothel assets to a new location (Gilman Depo. at 23-25), provides evidence of both intent to resume use and valid reasons for nonuse in the relatively short period of time CPS has had an interest in the mark.[7]

---

[6] At a minimum, there is a factual dispute regarding whether the trademark was inadvertently left out of the first auction attempt. (See Struble Depo. at 47-49; Brandt Depo. at 66-67.)

[7] Furthermore, we note that considerable goodwill remains in the "world famous" Mustang Ranch mark.  BLM attorney Alf Brandt testified that seemingly valueless items, such as the health inspection certificate for the brothel's hot tub, sold for hundreds of dollars in the Government auctions.  In addition, the numerous entities that have attempted to use the trademark and litigate for their rights in the mark testify to the exceptional goodwill associated with the Mustang Ranch brothel.  While a finding of intact goodwill is not an absolute prerequisite for defeating charges of abandonment, Beech-Nut Packing Co. v. P. Lorillard Co., 273 U.S. 629, 632 (1927), it has been a factor of consideration for some courts, see e.g. Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2nd Cir. 1980); EH

Thus, when the facts are viewed in the light most favorable to the non-moving party, CPS, the four-year period of nonuse was likely caused by a slow-moving bureaucracy's attempts to obtain control over and assess its newly acquired assets, determine what it could and could not use, transfer the useful portions to the appropriate government agency, and ultimately sell the mark and its goodwill to a party who did intend to use the mark for brothel services as soon as it was able to relocate the property.  As such, Plaintiffs have not proved abandonment as a matter of law.

## C. Likelihood of Confusion

CPS requests a finding on summary judgment that the Burgesses' use is likely to cause confusion with CPS's mark.  Similarly, CAM requests a finding on summary judgement that its use cannot be infringing because it is not likely to cause confusion.

"The likelihood of confusion is the central element of trademark infringement, and the issue can be recast as the determination of whether 'the similarity of the marks is likely to confuse customers about the source of the products.'" GoTo.Com v. Walt Disney Co., 202 F.3d 1199, 1205 (9th Cir. 2000) (citations omitted).  The Sleekcraft factors guide the determination of a likelihood of confusion:  "(1) the similarity of the marks; (2) the relatedness of the two companies' services; (3) the marketing channel used; (4) the strength of [Plaintiffs'] mark; (5) [Defendant's] intent in selecting its mark; (6) evidence of actual

---

Yacht LLC, 84 F. Supp. 2d at 566.

16

confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers." Id.

The eight-factor test is a "pliant one, in which some factors are much more important than others," depending on the facts of the case. Id. The "trinity" of the first three factors "constitutes the most crucial body of the Sleekcraft analysis." Id. at 1207. The Ninth Circuit has noted that very little weight, if any, should be given toward intent to confuse in a trademark infringement case. Id. at 1208. It has also cautioned that while actual confusion is a factor to be considered, it is not necessary to a finding of likelihood of confusion. Id.

**1.  The Burgesses' Use**

Both the Burgesses and CPS agree that the first three factors are met in the case at bar. However, the parties dispute who owns the mark, and thus, who's use would be infringing. Because we have found that genuine issues of material fact exist as to abandonment, and thus, ownership, of the mark, we cannot determine which party's use is infringing at this time. Thus, while it appears undisputed that Plaintiffs' use of the mark in conjunction with brothel services would infringe Defendants' mark if the Defendants are found to be the rightful owners, we reserve judgment on this issue until ownership can be determined.

**2.  CAM's Use**

CAM requests that we find that its placing an ad adjacent to the Mustang Ranch's ad in the Yellow Pages and its having links to the Mustang Ranch on its website is not use of the mark and cannot cause confusion. In examining the record, we conclude that a

17

factfinder could find that The Yellow Pages ad in question and the references to the Mustang Ranch on the Wild Horse Ranch's website appear to play off each other so as to capitalize on each other's good will.  Therefore, we find that genuine issues of material fact exist as to whether CAM's use would be infringing, should Plaintiffs be found to be the owners of the mark.

**IT IS, THEREFORE, HEREBY ORDERED** that, as addressed above, Defendant Cash Processing Services's Motion for Summary Judgment (#149) is **DENIED**.

**IT IS, FURTHER, HEREBY ORDERED** that, as addressed above, Defendant Cash Asset Management's Motion for Summary Judgment (#150) is **DENIED**.

**IT IS, FURTHER, HEREBY ORDERED** that, as addressed above, Plaintiffs Motion for Summary Judgment (#151) is **DENIED**.

DATED: This __22nd__ day of February, 2006.

_____
UNITED STATES DISTRICT JUDGE

18